**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

**MORGAN T. ZURN**
MASTER IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

December 12, 2016

Raymond J. DiCamillo, Esquire
Matthew D. Perri, Esquire
Richards Layton & Finger
902 North King Street
Wilmington, DE 19801

Mr. Dov Charney
1809 Apex Avenue
Los Angeles, CA 90026
DovCharneyPersonal@gmail.com

> Re:  *Standard General L.P., et al. v. Dov Charney*
> C.A. No. 11287-CB
> Date Submitted: December 9, 2016

Dear Mr. Charney and counsel:

This letter serves as my final report and recommendations pursuant to Chancellor Bouchard's November 7, 2016, Order appointing me as a special master in this case. It is based on the parties' submissions and four teleconferences between November 21 and December 9. I write for the parties and Chancellor Bouchard, who are familiar with the underlying facts as alleged. I address each of the Order's delegated topics in turn.

## I.     The End Date of the Relevant Period for Discovery

Litigation on the issues raised by Mr. Charney's pleadings began when he sued Standard General in California in June 2015. Standard General initiated this Delaware action in July 2015. Mr. Charney's June 2016 Answer and Counterclaims in this case comprise his California allegations and some additional allegations of events that occurred after June 2015, mostly in the context of Mr. Charney's theory that Standard General failed to mitigate damages.[1]

Mr. Charney seeks discovery through the present regarding Standard General's overarching strategy with regard to American Apparel and whether it was successful. He asserts Standard General's role in American Apparel through American Apparel's first bankruptcy, which ended in January 2016, and the second bankruptcy, which began in November 2016 and is still pending, demonstrates Standard General's unclean hands in their dealings with Mr. Charney. He asserts the bankruptcy court did not fully develop those issues. Standard General argues a discovery cutoff of June 2015 represents the date this litigation essentially started, allows efficient privilege determinations, and encompasses the relevant facts.

---

[1] *E.g.*, Ans. ¶ 77 (referencing an October 2015 text message Charney alleges exemplified Standard General's "effort to gag him in public"); *id.* ¶ 81 ("[F]rom September, 2014 until the company entered bankruptcy in October 2015, Charney continuously attempted to buy out Standard General's interests in American Apparel."); *id.* ¶ 87 (alleging Standard General's nominees voted against considering a December 2015 buyout offer); *id.* ¶ 89 (alleging Standard General refused Charney's third party financing during the first bankruptcy).

Standard General argues its role in the first bankruptcy was adjudged in those proceedings.

I recommend a discovery cutoff of June 22, 2016, the date of Mr. Charney's Answer in this case. I agree with Standard General that a cutoff at the date litigation began provides an efficient metric for determining privilege and relevance. This is particularly the case for Standard General's claims, which are based on the enforceability of contracts dated June 2014. However, adopting a June 2015 cutoff would be tantamount to striking allegations in Mr. Charney's Answer of events that occurred after June 2015. I see no basis for doing that at this juncture.

A June 22, 2016, cutoff confines discovery to the claims and defenses alleged in the pending action, which mostly center on the 2014 agreements. It also permits Mr. Charney to seek discovery (where otherwise proper) regarding Standard General's continued involvement in American Apparel nearly two years after the 2014 agreements and Mr. Charney's June 2014 ouster, including through the first bankruptcy.[2]

Mr. Charney did not provide any specific support for his theory that Standard General's actions after June 2016 are relevant. His theory of a long con

---

[2] I believe determining the first bankruptcy's preclusive effect on this case requires a more developed record and a more formal, nuanced application of preclusion principles than has been presented to date. I make no recommendation on that issue.

as pled ends with the first bankruptcy, which was resolved before June 2016. Counsel for Standard General explained that in the second bankruptcy, Standard General is an unsecured lender without a presence on the board. I see no basis to conclude that discovery after June 22, 2016, is reasonably calculated to lead to the discovery of admissible evidence. I also note the burden of ongoing rolling discovery of electronically stored information, given Standard General's continued involvement in American Apparel such that search terms would continue to generate hits and privileged documents. Finally, I believe June 22, 2016, is an equitable compromise between the parties' suggested cutoffs.

## II.     The Identity of Custodians

The parties agreed to four custodians for Standard General's documents. Mr. Charney requested two additional custodians. The first, Stephen Usher, is a Standard General partner and head of external relations. Mr. Charney asserted Mr. Usher was responsible for Standard General's fundraising and communications with limited partners. Mr. Charney's Answer alleges Standard General's Soo Kim fraudulently induced Mr. Charney to enter into the Standstill Agreement at issue by explaining it was necessary to appease Standard General's investors, who were upset with the investment in American Apparel.[3] Mr. Charney alleges that in fact, Standard General was executing a long con to take over American Apparel and

---

[3] *See* Ans. ¶¶ 29-41.

advance Standard General's interests at the cost of sending American Apparel into bankruptcy.[4]  Mr. Charney contended that Mr. Usher's documents would show whether Mr. Kim's statements regarding investor pressure were true or whether Standard General had other motivations.  Mr. Charney's Answer does not name Mr. Usher.

Standard General responded that Mr. Usher was unlikely to have any unique nonduplicative documents, as the agreed-upon custodians (including Mr. Kim) would have evidence of Mr. Usher's discussions with other Standard General employees regarding limited partners' concerns.  In response to that argument, Mr. Charney explained he specifically sought Mr. Usher's communications with limited partners and investors.  Standard General replied generally that such communications are not relevant and that adding Mr. Usher as a custodian would add time, cost, and burden.

Court of Chancery Rule 26(b)(1) permits broad discovery into "any matter, not privileged, which is relevant to the subject matter involved in the pending litigation."  Mr. Charney's allegations as to why he agreed to the Standstill Agreement are sweeping but specific, and his contention as to the relevance of Mr. Usher's unique documents to those allegations is also specific.  Mr. Charney is at this point entitled to take discovery regarding whether Mr. Kim's statements were

---

[4] *See, e.g., id.* ¶¶ 7-12.

false, the defendant's knowledge of or belief as to that falsity or reckless indifference to the truth of the representation, and the defendant's intent to induce Mr. Charney.[5] I agree with Standard General that if Mr. Kim communicated with Mr. Usher on this topic – *e.g.*, if Mr. Usher related investor pressure to Mr. Kim – those communications would be captured in Mr. Kim's documents. But Mr. Charney has specifically requested Mr. Usher's communications with investors to prove or disprove the truth of Mr. Kim's statements about investor pressure that allegedly induced Mr. Charney to enter into the Standstill Agreement. Standard General's protestations as to general irrelevance and burden fail to overcome Mr. Charney's specific contentions and allegations under Rule 26's broad terms. I recommend adding Mr. Usher as a custodian.

Mr. Charney also sought documents from Joseph Mause, Standard General's Chief Financial Officer. Mr. Charney's argument for adding Mr. Mause as a custodian was based wholly on Mr. Charney's assumption and hope that Mr. Mause would have relevant documents as a consequence of his title and position. Mr. Charney provided no specific basis for concluding Mr. Mause would have relevant documents. To the extent Mr. Mause is Mr. Kim's "right hand man," as Mr. Charney asserted, Mr. Kim would have responsive communications between

---

[5] *See Haase v. Grant*, 2008 WL 372471, at *2 (Del. Ch. Feb. 7, 2008).

the two.  I recommend denying Mr. Charney's request to include Mr. Mause as a custodian.

### III.  The Search Terms for Standard General's Documents

The parties have been conferring on search terms since September 2016. During that process, Mr. Charney repeatedly submitted additional search terms for Standard General's consideration, culminating in an October 7 proposal that contained 129 search topics, many of which included multiple terms (*e.g.*, a name and an email address) and as-yet-unidentified variants thereof.[6]  Mr. Charney suggested further conferring based on hit reports for his proposed search terms.

Standard General provided two proposals, A and B.  Proposal A contained American Apparel, Dov Charney, and their variants, but only in conjunction with several other narrowing terms.  Proposal A was associated with a more compressed proposed scheduling order.  Proposal B was simply:  "'American Apparel' OR APP OR americanapparel," and "Dov OR Charney OR dovcharneypersonal@gmail.com."[7]  Proposal B requires significantly more review to cull the hits to responsive documents, and was therefore associated with a more relaxed proposed scheduling order.

---

[6] Docket Item Nos. 104-105.

[7] I assume Standard General adopted this syntax with knowledge of how their process handles metadata and I therefore reviewed it unmodified even though it may be redundant, *i.e.*, "dov" may hit in "dovcharneypersonal@gmail.com."

The parties' extensive history in conferring on search terms, and the high number of search terms and undefined variants in Mr. Charney's proposal, made me doubt that additional conferring with hit reports on all of Mr. Charney's terms would be efficient or helpful. At the same time, I found myself unable to gauge the relative relevance and burden of Mr. Charney's proposed terms, or whether the subset of those terms in Standard General's Proposal A was optimal. For example, Standard General's Proposal A included Mr. Charney's name in conjunction with a number of last names. Mr. Charney's proposal included over one hundred names. I concluded it would not be constructive, or perhaps even possible, for me to learn each proposed person's relevance (or lack thereof) and evaluate the propriety and burden of search terms targeting that person.

I therefore told the parties on November 21 that I would recommend Standard General's Proposal B, under which Standard General's production obligations would be governed more by Mr. Charney's document requests and less by search terms. I recognized that proposal's greater burden on Standard General's review team and its sacrifice of search terms' technological efficiencies. It also heightened the need for Mr. Charney's document requests to be well tailored. But Standard General did make that proposal, and as explained below, I recommend an even more relaxed schedule than Standard General proposed in conjunction with Proposal B.

After I informed the parties of my recommendation on November 21, we spoke again on November 23. Mr. Charney expressed his concern that Proposal B's small number of search terms would not capture relevant Standard General documents on discrete issues that did not mention American Apparel or Mr. Charney by name.[8] I permitted Mr. Charney to submit by December 2 five additional search terms designed to generate discoverable material without any mention of American Apparel or Mr. Charney's name. Mr. Charney submitted the names "or variants thereof," email addresses, and phone numbers of three American Apparel board members (Sullivan, Mayer, and Danzinger), the American Apparel CEO Standard General hired in 2015 (Schneider), and the public relations professional for Standard General and American Apparel (Cohen) and her firm (Weber Shandwick).

On December 6, Standard General objected to Mr. Charney's proposal. Standard General asserted it was not confined to relevant issues that might not mention of American Apparel or Mr. Charney, as we had discussed. Standard General also asserted it would generate a high volume of irrelevant documents: for example, both Mr. Sullivan and Ms. Cohen were affiliated with Standard General not only through American Apparel, but also through other, entirely separate

---

[8] As examples, Mr. Charney referenced a "dot sale," a "$15 million loan," the "SC committee" or "suitability committee," and the retention of "Moelis," an investment banker.

Standard General investments. Standard General also argued that to the extent the individuals' names and contact information appeared on relevant documents, those documents would also mention American Apparel or Mr. Charney and therefore would have been hits under Proposal B.

After this exchange, Mr. Charney requested another conference call, which was scheduled for December 8. Minutes before that call, Mr. Charney provided to me a revised proposal for all the search terms to be applied to Standard General's custodians, which the parties had been discussing.[9] The parties and I discussed this submission and came to agreement on most of it, with the exception of search terms representing several individuals and firms that Mr. Charney wished to be run as standalone terms, *i.e.*, without being coupled to the American Apparel and Dov Charney terms in Standard General's Proposal B. Standard General asserted those standalone searches would generate an inappropriate volume of false hits. I directed Standard General to provide hit reports on Mr. Charney's desired standalone terms and scheduled another conference call for December 9.

On December 9, the parties informed me they agreed that several of the individuals could be targeted with standalone search terms, as those individuals were affiliated with Standard General only in the context of American Apparel. The remaining individuals and firms were involved with Standard General in other

---

[9] Docket Item 121.

contexts as well, and their search terms run as standalone terms totaled around 5,000 hits. The parties and I discussed the relevance and hit reports for each of those entities, which Standard General provided for the first time on the call. Standard General's hit reports were based on the June 2015 cutoff that they proposed, and Standard General explained that a longer discovery period would result in higher hit reports. My recommendations for the remaining disputed terms follow.[10]

a. Weber Shandwick and Liz Cohen

Standard General and American Apparel retained Weber Shandwick as their public relations firm after the agreements at issue were executed. Liz Cohen was their primary contact at Weber Shandwick. Standard General also retained Weber Shandwick and Ms. Cohen on other projects during this time, guaranteeing false hits. Search terms targeting Weber Shandwick email addresses generated 3,323 documents, 1,664 of which did not contain American Apparel or Dov Charney search terms. Standard General contended that nearly all communications with Weber Shandwick, as a third party service provider, would have indicated that the communication pertained to American Apparel to distinguish it from a different matter on which Weber Shandwick was also retained. Mr. Charney read an email

---

[10] My descriptions of these people and firms are not findings of fact, and are based on unrefuted statements during our calls that the parties explicitly reserved the right to refute at a later date.

from Liz Cohen to him into the record that confirmed this was likely the case.[11] In light of the guaranteed and burdensome false hits, I conclude the Proposal B terms would capture nearly all the relevant communications and recommend not using Weber Shandwick terms as standalone terms.

b. Moelis

Standard General hired Moelis & Company, an investment bank, on September 1, 2014, after the agreements at issue were executed. Standard General also retained Moelis on other Standard General projects during this time, guaranteeing false hits. Moelis as a search term generated 1,290 documents, 1,000 of which did not contain American Apparel or Dov Charney search terms. As with Weber Shandwick, Standard General contended that nearly all communications with Moelis would have indicated the communication pertained to American Apparel, and I agree. In light of the guaranteed and burdensome false hits, I conclude the Proposal B terms would capture nearly all the relevant communications and recommend not using Moelis as a standalone term.

---

[11] This conclusion is based on my assumption that email families will be kept together from collection to production, so that – as I mentioned in the December 9 call – an attachment from Weber Shandwick referring to American Apparel would draw an entire email family into the review, even if the cover email did not contain any Proposal B search term. Standard General should advise me if my assumption is incorrect.

c. Cooper and PJSC

Peter J. Solomon Company ("PJSC"), an investment banking advisory firm, worked with American Apparel during the period of Mr. Charney's ouster and negotiated with Standard General during the key July 2014 timeframe. Mr. Charney proposed "PJSC" as a metadata search term (to be applied to the to/from/cc/bcc fields) as he believes that is the email domain used by PJSC employees. Standard General ran PJSC as a search term in document content and generated 750 hits; a little over one hundred of those did not mention American Apparel or Mr. Charney. Standard General did not provide a hit report for PJSC as a metadata search term. Mr. Charney's December 8 submission included the term "Cooper" because he believed a Mr. Cooper was the PJSC representative on the American Apparel matter, but on December 9 Mr. Charney agreed communications with the representative would be covered by a metadata search for PJSC. I must assume that the proportion of standalone hits for PJSC as a metadata term would be comparable to the proportion of standalone hits as a content term: approximately 100 out of 750, which Standard General described as "incremental." Given this incremental increase in documents and the relevance to both parties' claims, I recommend running PJSC in the email metadata fields as a standalone search term.

d. Thomas Sullivan's email address[12]

Standard General appointed Mr. Sullivan as a board member of American Apparel after the agreements at issue.[13] He was also a board member of Media General, a concurrent Standard General investment; this guarantees false hits. Running Mr. Sullivan's email address in the email metadata fields as a standalone term resulted in over one thousand additional documents that did not mention American Apparel or Mr. Charney. Unlike communications with Weber Shandwick or Moelis, I am not convinced that Standard General communications including Mr. Sullivan would necessarily have specified the project (*i.e.*, Media General or American Apparel). His internal role on the board, as compared to the third party status of an outside service provider, might mean his communications were less formal, and the context might have been apparent from other sources, such as the communication's other recipients. The burden of reviewing the additional 1,000 documents is relatively low, particularly since relevance hinges on the binary issue of whether the document pertains to American Apparel or Media General. I recommend running his email address in metadata fields as a standalone search term.

---

[12] On the December 9 call, I concluded that Standard General had agreed to run Mr. Sullivan's email address as a standalone term. A review of that call, particularly in the context of Standard General's December 6 written objection to doing so, indicates my conclusion may have been inaccurate. My recommendation for Mr. Sullivan is therefore not based on any agreement by Standard General.

[13] *See* Ans. ¶ 57.

e. <u>Magnacca</u>

Standard General appointed Mr. Magnacca to American Apparel's board in August 2014, after the agreements at issue, and he remained on the board through American Apparel's first bankruptcy, until around January 2016.[14]  Mr. Magnacca also served as the CEO of Radio Shack, a concurrent Standard General investment; this guaranteed false hits.  Running his name as a standalone term resulted in 1,523 documents, 853 of which did not contain American Apparel or Dov Charney search terms.  As with Mr. Sullivan,  I am not convinced that Standard General communications including Mr. Magnacca would necessarily have specified the project (*i.e.*, Radio Shack or American Apparel).  His internal role on the board, as compared to the third party status of an outside service provider, might  mean his communications were less formal, and the context might have been apparent from other sources, such as the communication's other recipients.  The burden of reviewing the additional 850 documents is relatively low, particularly since relevance hinges on the binary issue of whether the document pertains to American Apparel or Radio Shack.  I recommend running his last name in email metadata fields as a standalone search term.

---

[14] *See* Ans. ¶ 57.

f.   Search Terms

The search terms to be applied to Standard General's custodians, resulting from my discussions with the parties and my recommendations here, are as follows:[15]

1.  Dov OR Charney OR dovcharneypersonal@gmail.com

2.  "American Apparel" OR APP OR americanapparel

3.  (terminat* OR fire* OR firing OR oust* OR investigat* OR suspen* OR misconduct OR wrongdoing OR harassment) AND (Dov OR Charney OR dovcharneypersonal@gmail.com OR "American Apparel" OR APP OR americanapparel).

This search string is subsumed within items 1 and 2, but the parties agreed to it and I believe it may aid in focusing review.

4.  To, From, CC, or BCC field contains any of:

- any of three email addresses for Colleen Brown
- Mintz
- Danziger
- Mayer
- Lasha Lee's email address
- either of two email addresses for Linden Lea
- either of two email addresses for Paula Schneider
- Chang's email address
- Grayson
- Sbrubaker and his email address
- PJSC
- Thomas Sullivan's email address
- Magnacca

---

[15] The parties and I spoke several times about how the search terms would apply to text messages, but tabled that issue for a time when the issue might be more crystallized.

I do not know the relevant email addresses but I do not believe they are disputed. The parties agreed to all of these standalone terms except for PJSC, Mr. Sullivan's email address, and Magnacca, which I recommend.

5. (Dov OR Charney OR dovcharneypersonal@gmail.com OR "American Apparel" OR APP OR americanapparel) AND the To, From, CC, or BCC field contains Moelis OR Shandwick OR Liz Cohen's email addresses.

This search string is subsumed within items 1 and 2, but I believe it will aid in focusing review. I do not know Ms. Cohen's email addresses but I do not believe they are disputed.

6. ("Irving Place" OR Guggenheim OR "Goldman Sachs" OR "Capital One" OR Monarch OR Coliseum OR Pentwater) AND (Dov OR Charney OR dovcharneypersonal@gmail.com OR "American Apparel" OR APP OR americanapparel).

This search string is subsumed within items 1 and 2, but the parties agreed to it and I believe it may aid in focusing review.

## IV.    A Proposed Scheduling Order

Each party provided a proposed scheduling order. Mr. Charney's proposed trial in July, 2018, while the more relaxed of Standard General's two proposals anticipated trial in June, 2017. Accordingly, Mr. Charney's proposal built in much more time for document production, document review, and depositions. On November 21, I began the discussion by repeating the Chancellor's earlier suggestion of a fall 2017 trial date. Mr. Charney explained that he is litigating this case alone, with only sporadic, casual legal assistance from acquaintances, and that he has dyslexia. He suggested he needed three to five months to review documents

prior to taking depositions, and generally needed more time for each phase than a fall 2017 trial date would permit.

I appreciate Mr. Charney's situation, and it is just to afford him the time he requires to review the discovery he receives and prepare his case. At the same time, I am mindful of the simultaneous goal of a speedy and inexpensive determination of this action, which I do not think is served by a July 2018 trial date.[16]

Based on those considerations, and subject to the Chancellor's availability, I recommend a December 2017 trial date. I make no recommendation as to the length of the trial. During the November 21 teleconference, I stated I would recommend that updated discovery requests, which Mr. Charney has been discussing for several weeks, would be due on December 16, 2016. My full scheduling recommendation is attached in a recommended scheduling order based on Standard General's form. As discussed with the parties, I dedicated the extra time over and above Standard General's proposed timeline to review of produced documents and completion of fact discovery.

---

[16] *See* Del. Ct. Ch. R. 1.

**Conclusion**

I gratefully share my impression that the parties participated in this process in good faith. Please recall that pursuant to the Chancellor's Order, exceptions to this report must be filed within five business days of the date of the report.

Sincerely,

*/s/ Morgan T. Zurn*
Master in Chancery

Exhibit Attached